**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**July 24, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

# UNITED STATES COURT OF APPEALS
# TENTH CIRCUIT

UNITED STATES OF AMERICA,

      Plaintiff-Appellee,

v.

      No. 05-2319

FRANK DAVID BROWN,

      Defendant-Appellant.

**Appeal from the United States District Court**
**for the District of New Mexico**
**(D.C. No. CR-04-2243 WPJ)**

Benjamin A. Gonzales, Assistant Federal Public Defender, Albuquerque, New Mexico, for Defendant-Appellant.

David M. Walsh, Assistant U.S. Attorney (David C. Iglesias, United States Attorney, with him on the brief), Albuquerque, New Mexico, for Plaintiff-Appellee.

Before **HENRY**, **SEYMOUR**, and, **TYMKOVICH**, Circuit Judges.

**SEYMOUR**, Circuit Judge.

Frank David Brown appeals his conviction on one count of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). Mr. Brown pled guilty but preserved his right to appeal the district court's denial of his motion to suppress evidence. For the following reasons, we affirm.

**I**

At approximately 9:53 a.m. on October 12, 2004, an unidentified male called 911 to report that a woman by the name of Shante was being held hostage by an armed man in apartment 22 at 424 Jefferson Street, Northeast. The caller stated that he had been visiting Shante when the man entered the apartment with a handgun in his back pocket. Shante and the man started arguing and Shante asked him to leave, but he refused. The caller stated that be believed the man was an ex-boyfriend Shante had tried to evict earlier in the day. The caller stated that Shante was afraid of the man and cowered against a wall when the man brandished his handgun. The caller tried to intervene, but the man told him to stay out of it. When the operator asked his name, the caller immediately replied "Tyrone," but shortly thereafter indicated he wished to remain anonymous. Rec. vol. IV at 14. The caller stated that he had left the apartment "before [he could get] shot dead." He insisted repeatedly that Shante needed help. *Id*. at 16. He urged the operator to "please hurry" several times, *id*. at 15, and at one point demanded that she "[j]ust get somebody over here before he shoots that girl." *Id*.

-2-

at 18. When asked whether he thought she would answer if the 911 operator called her, he replied, "No, I doubt . . . he probably won't let her answer the phone." *Id.* The 911 operator designated the call a "priority one," meaning it involved a direct threat to someone's life or property.[1] *See id.* at 8.

While the caller was on the phone with the 911 operator, the operator was communicating with the Albuquerque Police Department (APD) dispatch. It is unclear from the record whether this communication was written or verbal.[2]

_____

[1] Michael Sullivan, an employee of the Albuquerque Police Department's dispatch unit, testified at the suppression hearing that both emergency and non-emergency calls are routed through the same computer system. Rec., vol. IV at 7, 32-33. He said that in this specific case, the 911 operator initially typed information into the computer that resulted in a priority designation of "two," but she later changed the designation to "priority one" as she continued to gather information from the caller. *Id.* at 32-33. Mr. Sullivan affirmed that a priority one call is an emergency call. *Id.* at 8. *See also id.* at 39.

[2] Mr. Sullivan testified that 911 operators take calls from the public and pass on information to dispatch employees who, in turn, communicate with police officers in the field via radio. *See* Rec., vol. IV at 6-7. He said that all 911 calls are recorded, as are radio communications between dispatch and police. *Id.* at 5-6. On cross-examination, Mr. Sullivan seemed to suggest that information regarding a call is relayed by the 911 operator to dispatch by way of a written report. *See id.* at 23-24, 32. The report for the call at issue appears to have been an exhibit at the suppression hearing, but it is not included in the appellate record. Accordingly, the record does not reflect what information known to the 911 operator, such as the caller's first name, for instance, was actually conveyed to dispatch. On the basis of this record, therefore, we are not prepared to say that the caller's first name was within the "collective knowledge" of the detaining officers by virtue of the fact that it was communicated to the 911 operator. *See United States v. Shareef*, 100 F.3d 1491, 1503-04 (10th Cir. 1996) (explaining "collective knowledge" doctrine). We are especially reluctant to do so when it is clear from the record that dispatch believed the caller was female and relayed this erroneous information to the officers. Under the specific facts presented by the

(continued...)

Dispatch in turn contacted several police officers in the field.  The

communication from dispatch to the officers was as follows:

> The Zia Plaza Apartments, 424 Jefferson, Northeast, 424 Jefferson.
> In apartment 22, there's going to be a BMA about twenty-six years of
> age, refusing to let caller leave.  Advising that the subject should
> have a gun in his back pocket.  Advising [inaudible] approximately
> thirty-six year-old BFA.  Male is going to be about six feet tall with
> a thin build wearing a black shirt and black pants.  Possibly carrying
> a 22 or 25.  The BFA is going to be a "Shantella" [inaudible]
> situation advising that he's refusing to leave [inaudible] possibly an
> ex-boyfriend [inaudible] . . . .

Audio Tape: Gov't Ex. 2 at Suppression Hr'g (Oct. 12, 2004).

One of the officers asked dispatch to run a license plate check on a vehicle

parked near 424 Jefferson Street, and dispatch responded that the car was

---

[2](...continued)
record, it does not appear that the officers who detained Mr. Brown knew that the
911 call had been placed by a man named "Tyrone."  *See id*. at 1504 (holding a
presumption of communication between investigating officers is rebuttable by
evidence suggesting communication did not actually occur).

There is also evidence that, in addition to receiving a radio communication,
officers in the field also received, through computers in their patrol cars, the
information typed into dispatch's computer system by the 911 operator.  *See* Rec.,
vol. IV at 34, 38.  It is not clear from the appellate record, however, whether the
information received by the officers in the field through their computers is the
same as that received by dispatch, because the record does not contain any
communication by the 911 operator to either the officers or dispatch.  This
ambiguity has hampered our ability to assess precisely what information the
officers had before they detained Mr. Brown.  Although we conclude that the
evidence in the record, namely, the recording of dispatch's communication with
the officers, provided the officers with the reasonable suspicion necessary to
lawfully detain Mr. Brown, we take this opportunity to encourage the government
in the future to clarify exactly what information makes its way from the 911
operator to the officers.  It seems clear from this record that information known to
the 911 operator was not relayed by radio from dispatch to the officers, and this
fact has given us some pause.

registered to Shante Stillman, and the address on the registration was apartment 22, 424 Jefferson Street. After the officer obtained the information on the vehicle registration, the following exchange took place between dispatch and one of the officers:

> [OFFICER:] When you [got] the call from [the] caller, was she calling back from the home [inaudible] or did she advise you of a cell, or how was she able to get on the phone? Did she advise?
> [DISPATCH:] Apparently the call . . . the caller who is anonymous is not the actual Shante. Advising that it's possibly a friend because she's advising that she was with this girl earlier, and that the girl Shante was afraid of the ex-boyfriend coming back. She does have a [phone number] that's listed on the call. I don't know if it's a cell or not. But there is a [phone number] listed to Shante.
> [OFFICER:] So the caller is not Shante? But it is listed to her?
> DISPATCH: The caller is not Shante. It was an anonymous female, and [the 911 operator] did advise that this anonymous female called it in and said she was with Shante, and that she's a friend of hers.
> [OFFICER:] Ten-four. Did she advise that she is still with her? Or had she left?
> [DISPATCH:] She was no longer with her. The anonymous friend should not still be with her.
> [OFFICER:] Ten-four. Can you 21 the caller and see if she's anywhere in our area. We'd like to speak with her.
> [DISPATCH:] She's an anonymous female. Did not leave her name or 21 back.

*Id*.

As indicated above, one officer requested that dispatch call Shante's number, which the caller had provided to the 911 operator. No one answered the phone when dispatch rang Shante's number. An officer then reported they would attempt to knock on the door of the apartment, but shortly thereafter an officer exclaimed, "He's coming out." *Id*. at 50.

At Mr. Brown's suppression hearing, Police Patrol Officer Xavier Lopez[3] testified that, upon receiving notification from dispatch of a "priority one" domestic dispute involving an armed suspect, he and Officers Alex Marentes, John Montoya and David Jaramillo formulated a plan for approaching the apartment at 424 Jefferson Street. They planned to approach with their weapons ready and knock on the apartment door with guns drawn. Before the officers reached the door, however, Mr. Brown exited the apartment onto a breezeway. The following testimony by Officer Lopez explains what happened next:

> [OFFICER LOPEZ:] As I got – when we were set up, we were ready to go in [to the apartment] at that point, I hear Officer Marentes say – say, "he's coming out."
> [GOVERNMENT:] How did you hear that?
> [OFFICER LOPEZ:] I heard that over the radio. Apparently, [Officer Marentes] said it on his handle. He said, "he's coming out.". . .
> [GOVERNMENT:] And then so Officer Marentes said he was coming out. What happened next? . . .
> [OFFICER LOPEZ:] That point, myself, Officer Montoya, [and] Officer Jaramillo pied out, basically just came out in a circle near the east stairway up near where the subject was at, at this point where we could see Officer Marentes begin to give him commands to show him his hands.
> [GOVERNMENT:] So everyone had their weapons drawn; is that correct?
> [OFFICER LOPEZ:] Everyone has their weapons drawn.
> [GOVERNMENT:] And it might sound kind of obvious, but why?
> [OFFICER LOPEZ:] Didn't want to get shot. Subject possibly has a

---

[3] Officer Lopez testified his duties as a patrol officer involve "responding to calls that come into our dispatch, from 911 calls to non-emergency calls, proactive activity . . . basically protection of the community. I'm in a marked patrol vehicle, and I'm actually driving around in a certain area in Albuquerque." Rec., vol. IV at 36.

gun. We're thinking this is probably the subject that this anonymous caller is talking about. I guess that's it . . . .

[GOVERNMENT:] What happened next?

[OFFICER LOPEZ:] At that point, we slowly walked up the stairs, continued to have our guns drawn. We're giving commands: "Show me your hands. Show me your hands. Make sure I can see your hands." At some point, I had the subject get down on his knees, put his hands behind his back while Officer Montoya covers. And what I mean by that is he's got his rifle on target to this subject. I went ahead and holstered, handcuffed the subject . . . .

[GOVERNMENT:] . . . What did you do next? Did you pat him down?

[OFFICER LOPEZ:] At that point, basically simultaneously, as I began to pat him down, I asked him, "Do you have any weapons on you?" He immediately said, "Yes. I have a gun in my left rear pocket."

[GOVERNMENT:] Okay. And did you remove the firearm?

[OFFICER LOPEZ:] I did.

[GOVERNMENT:] Okay. And what did you do next?

[OFFICER LOPEZ:] At that point, we detained the subject who identified himself as Frank Brown, detained him. Obviously, we took the weapon away. I then continued my investigation and went to talk to Shante.

Rec., vol. IV at 50-52.

Mr. Brown was charged with being a felon in possession of a firearm. Prior to trial, he filed a motion to suppress the handgun and statements made to police following his detention, claiming the 911 call was anonymous and did not provide the officers with reasonable suspicion to stop and search him. After conducting a hearing, the district court, ruling from the bench, denied Mr. Brown's motion to suppress. In reaching its conclusion, the court found that the 911 call precipitating Mr. Brown's detention was anonymous, but that the information provided by the anonymous caller had sufficient indicia of reliability

to provide the officers with reasonable suspicion to detain and frisk Mr. Brown. *Id*. at 96-97. Mr. Brown subsequently pled guilty, preserving the right to challenge the district court's ruling on appeal.

**II**

In reviewing the denial of a motion to suppress, "[w]e view the evidence in the light most favorable to the government and review the district court's factual findings for clear error. We review the district court's ultimate determination of reasonableness under the Fourth Amendment de novo." *United States v. Tucker*, 305 F.3d 1193, 1199 (10th Cir. 2002) (citation and quotation marks omitted).

The Supreme Court has said there are three types of police-citizen encounters:

> (1) consensual encounters which do not implicate the Fourth Amendment; (2) investigative detentions which are Fourth Amendment seizures of limited scope and duration and must be supported by a reasonable suspicion of criminal activity; and (3) arrests, the most intrusive of Fourth Amendment seizures and reasonable only if supported by probable cause.

*United States v. Davis*, 94 F.3d 1465, 1467-68 (10th Cir. 1996) (citations omitted). We agree with the district court and the parties that the detention here should be treated as an investigative detention. "To determine whether an investigative detention was constitutionally permitted, we must ask both 'whether the officer[s'] action[s were] justified at [their] inception, and whether [they

were] reasonably related in scope to the circumstances which justified the interference in the first place.'" *United States v. Soto-Cervantes*, 138 F.3d 1319, 1322 (10th Cir. 1998) (quoting *Terry v. Ohio*, 392 U.S. 1, 20 (1968)).

Under *Terry v. Ohio*, 392 U.S. at 30, officers may stop and detain an individual if they have a reasonable, articulable suspicion that criminality is afoot. *See Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). The Supreme Court has instructed that "[t]he concept of reasonable suspicion . . . is not readily, or even usefully, reduced to a neat set of legal rules . . . . In evaluating the validity of a [*Terry*] stop . . . , we must consider the totality of the circumstances – the whole picture." *United States v. Sokolow*, 490 U.S. 1, 7-8 (1989) (citations and internal quotation marks omitted).

At the time the officers detained Mr. Brown, they knew the following facts: (1) a vehicle registered to a "Shante Stillman" was parked near the Zia Apartment complex at 424 Jefferson Street, and the address on the registration was apartment 22, 424 Jefferson Street; (2) a friend of Shante had called 911, claiming that an armed man was holding Shante in apartment 22 and refusing to let her leave; (3) the friend had been present when the man entered the apartment and had seen the man's gun; (4) the caller believed the man might be an ex-boyfriend; (5) the 911 operator designated the call a priority one, meaning a direct threat to someone's life or property; (6) a telephone call placed to Shante's number was not answered; and (7) a man closely resembling the description provided by Shante's friend

exited apartment 22. We conclude this knowledge was sufficient to give rise to a reasonable suspicion.

Officer Lopez testified at the suppression hearing that, other than the fact that there was a car parked outside 424 Jefferson registered to a woman with the same first name as the alleged victim, all of the information known to the police was provided by the unidentified individual claiming to be a friend of Shante. Mr. Brown argues this unverified information did not give rise to a reasonable suspicion justifying his detention. He contends the 911 call precipitating his detention was an anonymous tip similar to the one held unreliable in *Florida v. J.L.*, 529 U.S. 266 (2000). In *J.L.*, the Supreme Court held an anonymous unrecorded and undocumented telephone call indicating that a "young black male standing at a particular bus stop and wearing a plaid shirt was carrying a gun," *id.* at 268, without more, was unreliable and therefore insufficient to justify a police officer's stop and frisk of the defendant. The Court noted that "the officers' suspicion that J.L. was carrying a weapon arose not from any observations of their own but solely from a call made from an unknown location by an unknown caller." *Id.* at 270.

As we said in *United States v. Browning*, 252 F.3d 1153 (10th Cir. 2001), however, "[i]n *J. L.*, '[a]ll the police had to go on . . . was the bare report of an unknown, unaccountable informant who neither explained how he knew about the gun nor supplied any basis for believing he had inside information about J. L.'"

*Id.* at 1157 (quoting *J.L.*, 529 U.S. at 271). In this case, we have considerably more information about and from the informant then was the case in *J.L.*

As the Second Circuit has explained,

[w]here informants are known . . ., a lesser degree of corroboration is required. *Compare Williams*, 407 U.S. at 146-47, 92 S.Ct. 1921 (upholding a Terry stop based on an uncorroborated tip from a known and previously reliable informant), *with White*, 496 U.S. at 331-32, 110 S.Ct. 2412 (holding that an anonymous tip justified a Terry stop because both innocent details and predictive information were corroborated). A known informant's reputation may be assessed and he may be held accountable if his allegations turn out to be fabricated. *J.L.*, 529 U.S. at 270, 120 S.Ct. 1375. While a proven track record of providing reliable tips may serve to bolster an informant's veracity, past performance is not the only way to show veracity. *See United States v. Canfield*, 212 F.3d 713, 719-20 (2d Cir. 2000). The veracity of identified private citizen informants (as opposed to paid or professional criminal informants) is generally presumed in the absence of special circumstances suggesting that they should not be trusted. *See Caldarola v. Calabrese*, 298 F.3d 156, 165-66 (2d Cir. 2002); *United States v. Rollins*, 522 F.2d 160, 164 (2d Cir.1975) (noting the "peculiar likelihood of accuracy" of a citizen informant's report).

*United States v. Elmore*, 482 F.3d 172, 180 (2d Cir. 2007). *See also Easton v. City of Boulder*, 776 F.2d 1441, 1449 (10th Cir. 1985) ("[T]he skepticism and careful scrutiny usually found in cases involving informants . . . from the criminal milieu, is appropriately relaxed if the informant is an identified victim or ordinary citizen witness."). Under the totality of circumstances, therefore, we assess whether the information received from the informant "bore sufficient indicia of reliability." *United States v. Jenkins*, 313 F.3d 549, 554 (10th Cir. 2002).

The officers in this case knew the caller was a friend of the alleged victim

and was present when the armed man entered her apartment. The fact that the officers did not know the caller's name is not dispositive on the question of anonymity. An unnamed individual who divulges enough distinguishing characteristics to limit his possible identity to only a handful of people may be nameless, but he is capable of being identified and thus is not anonymous. For example, if a tipster says "I wish to be anonymous, but I live at the apartment building on a certain street corner" or "I wish to remain anonymous, but I have a blue truck and work at the Burger King on a particular avenue," the person may have provided sufficient clues for an intrepid officer to find and identify him.

In the present case, it was reasonable for the officers to believe a limited number of people were both Shante's friend and present in her apartment on the morning of October 12, 2004.[4] The caller in this case belonged to a relatively small population, and therefore is not analogous to the anonymous caller in *J.L.* who did not distinguish him or herself from the more than two million people who lived in Miami-Dade County. *See J.L.*, 529 U.S. at 275 (Kennedy, J., concurring) ("a tip might be anonymous in some sense yet have certain other features, *either* supporting reliability *or narrowing the likely class of informants*, so that the tip

---

[4] The recording of the 911 call indicates the caller knew Shante fairly well. He knew her telephone number, the age of her child, and the child's whereabouts. He also knew that she had an appointment that morning. While it is true that he did not know her last name, *see* Rec., vol. IV at 16, we do not regard that as conclusive evidence that he was not a friend of Shante in light of the other things he knew about her that only a friend or close acquaintance would know.

does provide the lawful basis for some police action." (emphasis added)).

Although the police did not know the caller's name here, they knew enough about him to reasonably believe they could locate him had his call been simply intended to harass Mr. Brown. The caller was not free to "lie with impunity," because by making his identity readily knowable he risked criminal liability for reporting a false claim. *J.L.*, 529 U.S. at 276 (Kennedy, J., concurring). *See* N.M. STAT. § 30-39-1 (criminalizing the making of a false report to police). When a caller refuses to provide his name but nonetheless provides sufficient details regarding his identity to render him readily identifiable by police, we are persuaded that the caller is not anonymous in the same sense as the caller in *J.L.* was anonymous, and information furnished by such a caller therefore bears an indicium of reliability not present in *J.L.*[5] *See United States v. Terry-Crespo*, 356 F.3d 1170, 1174 (9th Cir. 2004) (holding where 911 call was recorded and transcribed and defendant gave his name but not his phone number, the calls "narrowed the likely class of informants," thus rendering the officers' reliance on it more reasonable than the officers' reliance on the anonymous tip in *J.L.*) (citing *J.L.*, 529 U.S. at 275 (Kennedy, J., concurring)).

We consider it another important indicium of reliability that the caller

---

[5] We caution that our ultimate conclusion regarding the reliability of the call should not be read as being based exclusively on the incomplete anonymity of the caller. This attribute is simply one among several meaningful indicia of reliability that, when reviewing the totality of circumstances in this case, led us to our present disposition.

claimed firsthand knowledge of the alleged conduct. *See Jenkins*, 313 F.3d at 554-55; *Browning*, 252 F.3d at 1157. The caller in this case specifically told the 911 operator that he was present when an armed man entered Shante's apartment and that he saw the man's gun. Furthermore, the caller remained on the phone with the 911 operator beyond the time of the police officers' arrival. It was not until the 911 operator terminated the call that the caller hung up. The presence of the tipster outside the apartment during his conversation with the 911 operator bolsters the credibility of the caller's claim that he was present at the apartment immediately prior. *See* Rec., vol. IV at 18-21 (relaying to the operator over the phone the movements of the police officers outside the apartment). So, importantly, the officers knew that the caller's information was based on firsthand knowledge and that it was contemporaneous. They were reasonable, therefore, in taking the caller's information more seriously than information obtained, for instance, through the report of a third party or reported sometime later than the described events. *See Terry Crespo*, 356 F.3d at 1177 (affording additional reliability to the tip because the caller "sought immediate police assistance within minutes of being threatened and described the suspect and the threat.").

Moreover, we consider it important that the caller's primary motive in contacting 911 – as is apparent from listening to the tape of the 911 call – was not to implicate the armed man but to obtain aid and protection for his friend. In *United States v. Hauk*, 412 F.3d 1179, 1188 (10th Cir. 2005), we stated in the

context of a non-emergency residential search that "[i]f anonymous, uncorroborated tips were deemed a sufficient basis . . . , malicious informants could use the device of a phoney tip to wreak injury (indignity, invasion of privacy, suspicion, and sheer annoyance) on their enemies, rivals or acquaintances without fear of being held responsible."[6] Here, the caller's only apparent motivation for calling 911 was fear for Shante's safety, an urgency that is clearly detectable in the tenor of the 911 call. Thus, his call is more analogous to a plea for help from a victim than to an informant's tip. In making this analogy, we are not saying callers will never falsely claim to be victims to "wreak injury . . . on their enemies," but rather that in such instances police can afford the caller

---

[6] We also pointed out in *United States v. Hauk*, 412 F.3d 1179, 1188 (10th Cir. 2005), that

> [e]ven if the informant is well-meaning, reliance on anonymous uncorroborated tips could result in searches based on far less than an objective reasonable basis. If in Mrs. Grundy' fertile imagination, the innocent doings of her neighbors assume the aspect of dire criminality, her report of her conclusions to the police does not mean that a reasonable basis for suspicion exists. Information is only as good as its source, and if police do not know the source and have no other means for verifying the information, the mere fact that an anonymous tipster thinks there is mischief afoot is not a sufficient basis for police action.

We do not believe the outcome in the present case is adverse to this eminently reasonable proposition. First, the "doings" alleged in the present case were not innocent on their face. A man entering a residence uninvited with a gun in his back pocket and causing the occupants fear and alarm is not analogous to the observation of a neighbor digging in his backyard at odd hours. Second, it is reasonable to assume that a source who is concerned about the welfare of an identifiable third party is inherently more reliable than a source harboring general, non-particularized concerns.

-15-

greater credibility.  Accordingly, we conclude it was reasonable for the police to further credit the information provided in an emergency 911 call because the caller was apparently seeking protection and aid for a friend.

We also note that some relevant details provided by the caller were corroborated by the police.[7]   The information relayed by the caller indicated that the police would find a woman by the name of Shante and a tall, thin black male wearing dark pants and a dark shirt in apartment 22 at 424 Jefferson Street. When dispatch confirmed that a vehicle parked nearby was registered to Shante Stillman and that her address was apartment 22 at 424 Jefferson Street, a detail provided by the caller was meaningfully corroborated.  Moreover, when a man meeting the description provided by the caller emerged from apartment 22, another crucial detail was corroborated.[8]   The police also attempted to

---

[7]As noted earlier, the call was not anonymous as that term was used in *J.L.*, and thus police corroboration is not as prominent in our evaluation of reasonable suspicion here as it would be in anonymous tipster case. *See United States v. Elmore*, 482 F.3d 172, 181 (2d. Cir. 2007) ("when the informant is only partially known . . . a lesser degree of corroboration may be sufficient.").   Furthermore, we recognize that the information corroborated by the police here is of limited predictiveness and would not independently provide reasonable suspicion. Nevertheless, the corroboration lends some additional support, albeit more limited than if it were confirmed predictive information, to the caller's perceived reliability. *See J.L.,* 529 U.S. 272; *Elmore*, 482 F.3d at 183 ("Although [police] were not able to corroborate . . . predictive information . . . the police did corroborate a significant portion of the information in [the informant's] tip," including the accused's address "and that his car was parked outside.").

[8] We do not regard the relatively slight discrepancies between the caller's description of the armed man's attire and Mr. Brown's attire as an indication that

(continued...)

independently investigate the situation when they directed dispatch to call Shante. Shante's failure to answer the phone, while not proof that she was either injured or being held hostage, also did nothing to negate that possibility.

In reaching our conclusion, we do not ignore the fact that the caller specifically requested anonymity and expressly refused to meet with the officers face to face. In *Jenkins*, 313 F.3d at 554, we determined that an informant's allegations "bore sufficient indicia of reliability" partially on the ground that, although the informant had refused to provide his name, he agreed to face to face meetings with police. We stated that "[a] reasonable person in such circumstances would realize that in all likelihood the police could, if they so chose, determine the person's identity, and could hold him responsible if his allegations turned out to be fabricated." *Id.* Although the caller here refused a face-to-face meeting with the police, the police likely could have discerned his identity from the detailed statements he made to the 911 operator. A reasonable person in this caller's shoes would realize that in all likelihood the police could, if they so chose, determine his identity. While we do not say that refusing to meet with police face to face will never undermine a source's reliability, the

---

[8](...continued)
the caller's information was unreliable. The caller said "[h]e's wearing, I think, a black shirt, if I'm correct . . . [and] black pants." Rec., vol. IV at 15. Officer Lopez testified that Mr. Brown was wearing dark blue pants and "a blue patterned shirt, just different patterns on the shirt, blue." *Id*. at 54. This minor discrepancy does not undermine the caller's reliability.

record in this case suggests the caller refused to do so not because he was lying, but because he was afraid of the armed man he was implicating. *See Elmore*, 42 F.3d at 182 ("[w]hile [the caller] was unwilling to meet with [the officer] face-to-face, she had a good reason for her reluctance-she was afraid the defendant would retaliate against her."). Rather than undermining his reliability, the caller's evident concern actually supports the coherence of his story, namely, that the police are likely dealing with an armed, dangerous, and frightening individual.

In sum, we hold the information provided by the 911 caller here bore sufficient indicia of reliability to generate a reasonable suspicion justifying the officers' detention of Mr. Brown.[9] Those indicia were: (1) the caller's lack of true anonymity; (2) his reported contemporaneous, firsthand knowledge; (3) his stated motivation for seeking police intervention; and (4) limited police corroboration of facts provided by the caller. We stress that the outcome in this case is the result of a totality of the circumstances analysis, and although "[n]o single factor here is conclusive, . . . the informant's story and the surrounding facts possessed an internal coherence that gave weight to the whole." *Jenkins*,

---

[9]Mr. Brown argues that when he emerged from apartment 22, the situation ceased to be an emergency and the officers' role as community caretakers could therefore no longer factor into their decision to detain him. This might be a persuasive argument but for our conclusion that the officers already had reasonable suspicion to detain Mr. Brown before he vacated the apartment. That reasonable suspicion did not dissipate when Mr. Brown vacated the apartment.

-18-

313 F.3d at 556 (quotation marks omitted).

For the aforementioned reasons, we **AFFIRM**.