FILED
United States Court of Appeals
Tenth Circuit

May 8, 2024

Christopher M. Wolpert
Clerk of Court

<u>PUBLISH</u>

### UNITED STATES COURT OF APPEALS

### FOR THE TENTH CIRCUIT

———————————————

UNITED STATES OF AMERICA,

    Plaintiff - Appellant,

v.

LYNDELL DANIELS,

    Defendant - Appellee.

No. 22-1378

———————————————

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 21-CR-00332-RMR)**

———————————————

Elizabeth S. Ford Milani, Assistant United States Attorney (Cole Finegan, United States Attorney, with her on the brief), Office of the United States Attorney, Denver, Colorado, for Plaintiff-Appellant.

John C. Arceci, Assistant Federal Public Defender (Virginia L. Grady, Federal Public Defender, with him on the briefs), Office of the Federal Public Defender, Denver, Colorado, for Defendant-Appellee.

———————————————

Before **EID**, **SEYMOUR**, and **KELLY**, Circuit Judges.

———————————————

**SEYMOUR**, Circuit Judge.

———————————————

    Mr. Lyndell Daniels was detained by law enforcement who, by using his name, connected Daniels to a stolen Glock and charged him with being a felon in possession of a

firearm in violation of 18 U.S.C. § 922(g)(1). Daniels moved to suppress his name as the fruit of an unlawful investigative detention, arguing the officers had no reasonable suspicion to detain him. The district court agreed and granted his motion. On appeal, the government argues the district court erred because there was reasonable suspicion to detain Daniels. We affirm.

## Background

Just before midnight on February 7, 2021, the Aurora Police Department received a near-anonymous call. The caller expressed concern over something happening in her apartment complex's parking lot: Three Black men, wearing dark hoodies and jeans, were intermittently taking guns in and out of their pockets and getting in and out of a dark SUV. The caller believed they were "getting ready to do something," but conceded that it was not an emergency and reported no illegality. Rec., vol. I at 55. The call was logged as a non-emergency "area watch." *Id.*

Aurora Police Officers William Idler and Glenn Snow were dispatched to the caller's apartment, located in a high-crime neighborhood of Aurora, Colorado. The complex was densely populated, and the parking lot was well-lit. Officer Idler arrived first and identified what he assumed to be the reported dark SUV. Standing five to ten feet away from the SUV was Daniels. Daniels was wearing a bright orange jumpsuit with a reflective strip and an orange hood under a black jacket. Officer Idler testified that as he approached, Daniels appeared to say something (which he could not hear) to the SUV. At that point, the SUV left the parking lot at a normal rate of speed. Officer Idler identified himself and

2

ordered Daniels to put his hands up. Daniels immediately complied and was detained. Officer Idler acquired Daniels' name, ran a criminal background check, and discovered he was a convicted felon.

Police separately followed the dark SUV. The car drove lawfully, but eventually ran a red light and was stopped. Within the vehicle, officers found four firearms, one of which was a stolen 9mm Glock 17. Using Daniels' name, law enforcement obtained a warrant for his DNA. Subsequent forensic testing of the DNA tied Daniels to the stolen Glock. A grand jury indicted Daniels on the sole count of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). In response, Daniels moved to suppress his name as the fruit of Officer Idler's unlawful detention. The district court held an evidentiary hearing and then granted his motion. This appeal followed.

**Discussion**

The government argues that the district court erred in granting Daniels' motion to suppress because Officer Idler had reasonable suspicion to detain Daniels. When reviewing a district court's grant of a motion to suppress, we review factual findings for clear error and legal determinations de novo. *United States v. Morales*, 961 F.3d 1086, 1090 (10th Cir. 2020). "[We] view[] the evidence in the light most favorable to the district court's decision." *Id.* The ultimate question of reasonableness under the Fourth Amendment we review de novo. *Id.*

The Fourth Amendment establishes a right to be free from "unreasonable searches and seizures." U.S. Const. amend. IV. Even so, in *Terry v. Ohio*, 392 U.S. 1 (1968), the

3

Supreme Court clarified that "a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest." 392 U.S. at 22. In other words, the Fourth Amendment permits temporary detentions of individuals—so long as "the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate." *Id.* at 21–22. *See also United States v. McHugh*, 639 F.3d 1250, 1255 (10th Cir. 2011) (observing that the Fourth Amendment protects individuals from unreasonable "investigatory stops" and detentions). To be "reasonable" a police officer's investigatory stop must be "justified at its inception," and the "officer's actions must be reasonably related in scope to the circumstances which justified the interference in the first place." *United States v. Madrid*, 713 F.3d 1251, 1256 (10th Cir. 2013) (quoting *Terry*, 392 U.S. at 20) (internal quotations omitted). This appeal concerns only the first prong, i.e., whether Daniels' detention by Officer Idler was justified at its inception.

"An investigatory detention is justified at its inception if the specific and articulable facts and rational inferences drawn from those facts give rise to a reasonable suspicion a person has or is committing a crime," *id.* (quoting *McHugh*, 639 F.3d at 1255), or "that criminal activity 'may be afoot.'" *United States v. Sokolow*, 490 U.S. 1, 7 (1989). Police officers must have "reasonable suspicion that criminal activity 'is, has, or is about to occur.'" *United States v. Copening*, 506 F.3d 1241, 1246 (10th Cir. 2007); *see also United States v. Cortez*, 449 U.S. 411, 417 (1981) ("An investigatory stop must be justified by

4

some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity."). It is true that "the likelihood of criminal activity need not rise to the level required for probable cause," *United States v. Arvizu*, 534 U.S. 266, 274 (2002), but it is equally true that officers cannot rely on "inchoate and unparticularized suspicion[s] or 'hunch[es].'" *Sokolow*, 490 U.S. at 7. The Fourth Amendment requires "some minimal level of objective justification." *Id.* The objective nature of this standard is key. *See Terry*, 392 U.S. at 21–22 ("[I]t is imperative that the facts be judged against an *objective standard* . . . .") (emphasis added).

To determine whether a detaining officer had the required "particularized and objective basis for suspecting [a] particular person stopped of criminal activity," we consider the "totality of the circumstances—the whole picture." *Cortez*, 449 U.S. at 417–18. When making that determination, "a court may not evaluate and reject each factor in isolation." *Madrid*, 713 F.3d at 1256 (quoting *United States v. Gandara-Salinas*, 327 F.3d 1127, 1130 (10th Cir. 2003)). Indeed, "[c]onduct that may be wholly innocent may nonetheless support a finding of reasonable suspicion in certain circumstances." *United States v. Johnson*, 364 F.3d 1185, 1192 (10th Cir. 2004). All factors, "mitigating and aggravating," must be considered in the totality of the circumstances. *Id.* at 1193.

The parties agree Officer Idler detained Daniels for the purposes of the Fourth Amendment and so was subject to its strictures. The parties and the district court further agree that there were four relevant factors and circumstances known to Officer Idler when he detained Daniels: (1) the 911 phone call and Computer Aided Dispatch ("CAD") notes,

(2) the presence and actions of the dark SUV, (3) the time of Officer Idler's encounter with Daniels, and (4) the location of their encounter. The question before us is whether the district court properly analyzed and weighed these factors when determining Officer Idler did not have reasonable suspicion to detain Daniels. Our de novo review convinces us that the totality of the circumstances known by Officer Idler when he detained Daniels did not amount to reasonable suspicion. As such, Daniels' detention was unreasonable under the Fourth Amendment, and the district court's grant of Daniels' motion to suppress was proper. We address each factor before analyzing all together to determine whether the totality of the circumstances established reasonable suspicion. *United States v. Leon*, 80 F.4th 1160, 1166 (10th Cir. 2023).

1. The 911 Call

The district court began by analyzing the import of the near-anonymous 911 call. A tip to the police, like a 911 call, can "justify an investigatory stop if under the totality of the circumstances the tip furnishes both sufficient indicia of reliability and sufficient information to provide reasonable suspicion that criminal conduct is, has, or is about to occur." *Madrid*, 713 F.3d at 1258. Our analysis to determine a tip's reliability is "case-specific" and factor-based. *United States v. Chavez*, 660 F.3d 1215, 1222 (10th Cir. 2011). We consider:

> (1) [W]hether the informant lacked "true anonymity" (i.e., whether the police knew some details about the informant or had means to discover them); (2) whether the informant reported contemporaneous, firsthand knowledge; (3) whether the informant provided detailed information about the events observed; (4) the informant's stated motivation for reporting the information; and (5) whether the police were able to corroborate information provided by the informant.

6

*Id.* "[N]o single factor is dispositive." *Id.*

The district court eschewed this factor-based inquiry for a comparison between the instant case and *Florida v. J.L.*, 529 U.S. 266 (2000), in which the Supreme Court found that "the bare report of an unknown, unaccountable informant," unaccompanied by "specific indicia of reliability" was insufficient to establish reasonable suspicion. 529 U.S. at 269, 271. While the district court's comparative analysis was not per se improper, *see Chavez*, 660 F.3d at 1222 (comparing the factual circumstances between *J.L.* and the case before it), it was insufficient. Since *J.L.*, our circuit has articulated the nature of those "specific indicia of reliability," and the district court should have evaluated the presence (or lack thereof) of those indicia in its analysis. *See, e.g.*, *Chavez*, 660 F.3d at 1222; *Copening*, 506 F.3d at 1247; *United States v. Brown*, 496 F.3d 1070 (10th Cir. 2007); *Madrid*, 713 F.3d at 1258. *United States v. Johnson* is illustrative: There, when considering the reliability of an anonymous tip, we were "mindful of the concerns expressed in *J.L.*," but ultimately evaluated those concerns alongside the specific facts of Johnson's case. *See* 364 F.3d at 1191.

As we review the facts of this case under the proper analysis, the call is close. All the indicia we traditionally consider appear to be present, but to varying degrees of potency. The 911 call *alone* was certainly insufficient to establish reasonable suspicion— indeed, the government itself does not contend that it was sufficient—and the call's reliability, even when placed alongside the other facts of this case, is not determinative.

Nonetheless, even assuming its reliability, we afford the 911 call little weight. In *Navarette v. California*, 572 U.S. 393 (2014), the Supreme Court observed that even a reliable tip must create "reasonable suspicion that 'criminal activity may be afoot.'" 572 U.S. at 401 (citing *Terry*, 392 U.S. at 30). As an example, it noted that "a reliable tip alleging the dangerous behaviors [consistent with drunk driving] would justify a traffic stop on suspicion of drunk driving." *Id.* at 402. Here, we have assumed *arguendo* the 911 call's reliability, but that inquiry is separate from its utility in establishing reasonable suspicion. *Id.* The tip alleged no criminal activity or dangerous behaviors; the caller only reported that guns were being intermittently taken in and out of pockets, and that the three Black men "look like they are getting ready to do something." Rec., vol. I at 57. This may be odd, but it is not obviously illegal. Moreover, if we are to take seriously the normative thrust of the Supreme Court's recent decision in *New York State Rifle & Pistol Association, Inc., v. Bruen*, 597 U.S. 1 (2022), then we cannot look with suspicion on citizens presumably exercising their Second Amendment rights in a lawful way. 597 U.S. at 70 ("The constitutional right to bear arms in public for self-defense is not a 'second-class right . . . .'").

Granted, "reasonable suspicion may exist even where a 911 call fails to allege criminal activity," *see United States v. Conner*, 699 F.3d 1225, 1231 (10th Cir. 2012), but the described activity here, i.e., three Black men looking like they were about to "do something," getting in and out of an SUV, is simply too generic. The men were not yelling or hollering or running or disturbing anyone or, frankly, doing much of anything. Another

8

caller reporting that she was nervous because three armed Black men were relaxing alongside an SUV would have been just as descriptive and (un)helpful in establishing reasonable suspicion.

The tip is even less useful in establishing reasonable suspicion for Daniels. Recall, the 911 call could have only helped establish reasonable suspicion for the individuals or things described. *United States v. Fisher*, 597 F.3d 1156, 1158–59 (10th Cir. 2010) ("The particular person that is stopped must be suspected of criminal activity."). The district court found that it would have been "objectively unreasonable" for Officer Idler to believe that Daniels was one of the men described, because he "so obviously did not match the description of the individuals identified by the caller." Rec., vol. I at 115. When asked during testimony, Officer Snow, who accompanied Officer Idler to the scene, agreed that Daniels "did not match the description . . . that the caller had given." Rec., vol. IV at 76. "Other than the fact that he was black, there was nothing about the Defendant to suggest that he was one of the individuals described by the 911 caller." Rec., vol. I at 115. We agree. That criminal activity might be afoot does not give police carte blanche to arrest everyone who happens to be nearby. *See Fisher*, 597 F.3d at 1158–59.

We consider the 911 call in our totality analysis, but we appropriately "discount" the weight we afford it because of the call's supergeneric, innocuous nature and because Daniels himself was not described in it. *Johnson*, 364 F.3d at 1192.

9

2. The Presence and Actions of the SUV

The district court next considered the weight that should be given to the presence and actions of the dark SUV that was idling in the parking lot and that then drove away (ostensibly at the direction of Daniels) as Officer Idler approached. We hold that the SUV and its actions were insufficient alone to establish reasonable suspicion.

The government argued below and to us that Officer Idler had reasonable suspicion to stop Daniels because of Daniels' association with the SUV. We interpret this argument as raising two important inquiries: (1) whether the SUV itself was reasonably suspicious because of its presence and actions, and (2) the nature of Daniels' association with the SUV.

We address first whether the dark SUV itself was reasonably suspicious. The SUV at issue was idling in front of Daniels' apartment complex as Officer Idler approached. But it was far from the only vehicle present. Officer Idler's bodycam shows at least three other cars idling in front of the complex; at least three cars leaving or driving through the lot; one car parked in the no-parking loading zone; and no open parking spots to be seen. In other words, the parking lot was packed and busy, especially given the late hour. In that context, we do not find the dark SUV's mere presence in the lot to be odd, much less suspicious. We do not ignore that the 911 call reported that there was a "dark color SUV" in the parking lot. And, indeed, so there was. But the tip's support is ultimately superficial, and its practical utility limited. The bodycam footage shows two "dark color" SUVs, one black, the other burgundy, idling in the complex's lot, one right behind the other. The SUV at

10

issue in this case turned out to be the black SUV, but the caller gave no hint which one she was referring to. The CAD notes are absent of any make, model, color, or license plate number.[1] It was a coin flip then, as equally likely to be wrong as right, by Officer Idler when deciding which SUV's presence in the lot was "suspicious." In that sense, even assuming the tip's "reliabil[ity] in its assertion of illegality,"[2] it was certainly not reliable "in its tendency to identify a determinate person [or thing]." *J.L.*, 529 U.S. at 272. We are generally skeptical of anonymous or near-anonymous tips, and even more skeptical when they are supergeneric, as here. *See Johnson*, 364 F.3d at 1191 ("Overly generic tips, even if made in good faith, could give police excessive discretion to stop and search large numbers of citizens."). The situation faced by Officer Idler as he approached the complex and was forced to proceed on an arbitrary hunch is a good illustration why.

Moreover, although reasonable suspicion does not demand witnessing illegal conduct, *Conner*, 699 F.3d at 1231 ("Reasonable suspicion may exist even where . . . the responding officers do not observe any illegal conduct."), Officer Idler did not observe any criminal activity or even the guns reported by the 911 tipster, weakening the claim that the SUV was inherently suspicious.[3] Indeed, our review of the record indicates that Officer

---

[1] The CAD notes did provide slightly more description for a nearby sedan, which the caller described as either "sil[ver] or white." Rec., vol. I at 58.

[2] Which, we again emphasize, the tip did not allege.

[3] The district court made a factual finding that "Further, there is no evidence here that the officers observed anything to suggest that the SUV or its occupants were carrying guns or otherwise engaged in illegal activity." Rec., vol. I at 117. Our independent review of the record confirms this assessment. *Morales*, 961 F.3d at 1090.

Idler did not witness *any activity whatsoever* by anyone in or near the SUV before the SUV drove away. We are ever "mindful of the concerns expressed in *J.L.*," *Johnson*, 364 F.3d at 1191, and we find the facts of this case uncomfortably reminiscent of the facts there. In *J.L.*, aside from an anonymous tip, the "officers had no reason to suspect" J.L. and his friends of any illegal conduct, the officers "did not see a firearm," J.L. and his friends made no threatening or otherwise unusual movements, and when the officers approached, J.L. was "just hanging out." *J.L.*, 529 U.S. at 268. Here, there was a near-anonymous tip that did not allege illegal conduct, no illegal conduct or firearms were seen, neither the SUV nor Daniels made any threatening or unusual movements, and the SUV appeared to be innocuously idling as Officer Idler approached.

Of course, the SUV did drive away as Officer Idler approached (ostensibly at Daniels' direction in Officer Idler's recount). This action by the SUV offers more, but ultimately insufficient, support to establish reasonable suspicion. Certainly, we can and do consider a suspect's evasive movements in determining reasonable suspicion, *see, e.g.*, *United States v. Briggs*, 720 F.3d 1281, 1286 (10th Cir. 2013), and "headlong flight" is far from the only behavior that is fair game, *see id.* at 1287.[4] The facts here make it difficult to

---

[4] Our caselaw requires something more than just walking away when the police arrive. After all, "not all attempts to avoid police contact raise suspicion[]." *Briggs*, 720 F.3d at 1287. The government cites several cases, but none are persuasively analogous. In *United States v. Briggs*, the defendants "changed direction" and "picked up their pace"; Briggs "repeatedly looked over his shoulder" and "grabbed at the waistline of his pants"; and one defendant was "nearly running." 720 F.3d at 1283,1287. In *United States v. Ballance*, we admitted that Ballance's "walking away from [a] gas station on foot" supported reasonable suspicion, but there was a tip alleging illegality and identifying Ballance's specific car. No.

determine whether the SUV was attempting to evade the police as it drove away. The

district court did not think it was, finding that the "SUV here simply left the parking lot."

Rec., vol. I at 117. The government does not allege that finding was clearly erroneous, and

upon our review of the record, we agree. *See Morales*, 961 F.3d at 1090. The bodycam

shows the SUV driving away at a normal rate of speed, a speed similar to that of a white

car that can be seen leaving as Officer Idler arrived. According to Officer Snow, who had a

better vantage point, the black SUV did not appear to drive away "at a high rate of speed"

or "jump a curb or anything like that," and otherwise simply, and safely, departed. Rec.,

vol. IV at 74. Further, the burgundy SUV left during the encounter, and another vehicle

drove several yards away when Officer Idler approached. This confirms that the parking lot

was busy with activity. We cannot say that simply leaving the lot, as the bodycam footage

shows several other cars similarly doing, indicated that criminal activity was afoot. In

*United States v. Davis*, 94 F.3d 1465 (10th Cir. 1996), we found that a defendant's "actions

in exiting [a] car, making and then breaking eye contact with the officers, and then walking

away from the officers" was not sufficient alone to establish reasonable suspicion. The

facts in this case offer even less support. 94 F.3d at 1468. The SUV driving away at a

normal rate of speed as Officer Idler approached is not enough to establish the

---

20-3141, 2022 WL 108330, at *6 (10th Cir. Jan. 12, 2022) (unpublished). *United States v. Madrid* stands for the proposition that the defendant's "attempted exit from [a] parking lot just after a police car drove by" *could* be considered in the reasonable suspicion analysis, 713 F.3d at 1257, which the district court here did not dispute. *United States v. Robinson* is the only case cited that has held that a simple "about-face" could contribute, but it is unpublished and its analysis is conclusory. 304 F.App'x 746, 751 (10th Cir. 2008) (unpublished).

13

"particularized and objective basis for suspecting" it of criminal activity. *Cortez*, 449 U.S. at 417.

That leads to our second inquiry, Daniels' association with the SUV. We interpret the government as arguing that Daniels' interaction with the SUV (ostensibly warning the SUV to leave as Officer Idler approached) both contributed to the reasonable suspicion of the SUV and linked Daniels to it. We are unpersuaded, because Daniels' connection to the SUV appears tenuous. The government alleges that the SUV left at the direction of Daniels. But Officer Idler did not hear what Daniels may have said to the SUV's occupants. True, we do "accord deference to an officer's ability to distinguish between innocent and suspicious actions," *see Madrid*, 713 F.3d at 1256, but we are not required to take on blind faith an officer's speculation on the contents of a conversation he admits he could not hear.[5] A fair inference for Officer Idler to have made was that there was some relationship between the occupants of the SUV and Daniels. But the nature of that relationship was unknown. This inference may have been sufficient if the SUV had done something else to be reasonably suspicious, but the other facts do not substantially indicate that Officer Idler had a "particular and objective basis" to suspect either Daniels (or the

---

[5] Indeed, we are especially reticent to accord much deference to Officer Idler's instincts given his contradictory narratives. In his summary of the stop, related the following day, Officer Idler reported a mundane, if ambiguous, scene: "I heard [Daniels] saying something when the Dark SUV pulled out of the parking lot and fled the scene." Rec., vol. I at 28. However, at his testimony, Officer Idler's story recast Daniels into the role of scout, warning the SUV to flee as he approached: "[T]he person in the orange jumpsuit with the black jacket on [Daniels] I heard say something to the people inside the black SUV, and then the black SUV took off." Rec., vol. IV at 29.

SUV) had been or was committing a crime. *See id.* That is, after all, our reasonable suspicion lodestar: whether the facts tended to show that Daniels committed or was about to commit a crime. *See Johnson*, 364 F.3d at 1189. His proximity to an innocuous SUV and an unknown conversation with its occupants who then simply left when Officer Idler approached do not tend to show that.

All of this can and must be considered in our final totality of the circumstances analysis, but we agree with the district court that neither the SUV's nor Daniels' presence or actions are sufficient alone to establish reasonable suspicion.

### 3.  The Time and Location

The district court finally considered the location and time of Officer Idler's encounter with Daniels. It observed that the stop occurred in a "high crime area" of Aurora, Colorado "in the middle of the night," and concluded that those facts, although insufficient alone, could be considered in the totality of the circumstances analysis. We agree.[6]

Of course, these factors do not operate as a "check-the-box" exercise or foreclose analysis of "relevant contextual considerations." *Wardlow*, 528 U.S. at 124. Here, Officer Idler detained Daniels near midnight. But the evening in question was February 7, 2021,

---

[6] Caselaw has extensively established that such facts can be considered. *See, e.g.*, *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000); *McHugh*, 639 F.3d at 1257; *United States v. DeJear*, 552 F.3d 1196, 1201 (10th Cir. 2009) (noting that "the fact that conduct occurs in an area known for criminal activity" should be considered when determining reasonable suspicion); *United States v. Clarkson*, 551 F.3d 1196, 1202 (10th Cir. 2009) ("This court has also considered the time of night as a factor in determining the existence of reasonable suspicion."); *Gallegos v. City of Colo. Springs*, 114 F.3d 1024, 1029 (10th Cir. 1997) (considering the time of night, 1:15 AM, in the reasonable suspicion analysis).

the night of the Super Bowl LV. An officer should have expected football fans celebrating (or commiserating about) the game's outcome late into the night. The time of day Officer Idler encountered Daniels is militated by the events of that day. Moreover, the district court found the parking lot was "well-lit," "densely populated," and "heavily trafficked," and we agree. Rec., vol. I at 119. This further militates against finding reasonable suspicion, because any actions taken by the SUV's occupants (or Daniels) would be easily seen and quickly reported, *which Officer Idler would have known*.

That the neighborhood was a "high-crime area" with police often getting calls for "domestic violence or people with weapons or other such various felonies or intense crimes," Rec., vol. IV at 20–21, did offer some objective and particularized reason for suspicion. But caselaw has been skeptical that such a factor can carry the day. *See, e.g.*, *United States v. Dennison*, 410 F.3d 1203, 1208 (10th Cir. 2005) ("[Defendant]'s presence in a high-crime area is not, 'standing alone,' enough to provide reasonable suspicion, but it may be a 'relevant contextual consideration' in a *Terry* analysis.").

Both the time and location factors are relevant, and so we consider them in our totality of the circumstances analysis below. But neither one was sufficient by itself to establish reasonable suspicion.

### 4.  Totality of the Circumstances

Having concluded that none of those factors alone establish reasonable suspicion, our task is now to consider the "totality of the circumstances—the whole picture," faced by Officer Idler as he approached and detained Daniels. *Cortez*, 449 U.S. at 417–18.

Our review of the records shows the following circumstances were known to Officer Idler as he approached and detained Daniels on that fateful February 7th night: (1) the police received an arguably reliable tip describing three Black men in dark clothing, holding guns, and getting in and out of a dark SUV; (2) the tipster believed the men were about to "do something" but reported no illegality; (3) based on the call, Officers Snow and Idler were dispatched on a "non-emergency area watch request"; (4) the officers did not see any of the men identified by the caller, but possibly identified the "dark color SUV" reported as a black SUV idling in front of the complex; (5) the officers did not see any guns or illegal activity when they arrived; (6) Officer Idler saw Daniels who was wearing a bright orange jumpsuit, orange jeans, and a black jacket; (7) Daniels was standing five to ten feet away from the black SUV; (8) Officer Idler thought he heard Daniels say something to the SUV, after which the SUV left the lot at a "normal rate of speed"; (9) Daniels did not have any guns, did not attempt to leave the scene, and initially complied with all of Officer Idler's orders; (10) the encounter took place near midnight; (11) the stop was in a high-crime area; and (12) the parking lot was busy, packed, and well-lit. Like the district court, we are not persuaded that these circumstances provided Officer Idler with reasonable suspicion to detain Daniels.

We again emphasize the principle that anchors our analysis: Officer Idler had to have a "particularized and objective basis" to believe *Daniels* had been or was committing, or was about to commit a crime or engage in criminal activity. *Cortez*, 449 U.S. at 417–18. That minimal objective basis was not met here. The supergeneric and vague 911 tip did not

17

allege illegal, or even particularly unusual, activity by the men the caller identified, and nowhere at all did it describe anyone akin to Daniels. As Officer Idler arrived, he was confronted by an unremarkable, frankly banal, scene: a packed and busy apartment parking lot with several cars leaving, idling in, and driving through it. It was perhaps a bit more puzzling given the late time of night, but that could have been plausibly explained by the trouncing the Buccaneers had shown the Chiefs only a few hours prior.[7] As the caller had described, there was a "dark colored SUV" outside, two in fact, but no hint as to which one the caller had been referring. Despite the area's reputation as a "high-crime area," the bodycam footage shows nothing was amiss, much less dangerous, as Officer Idler approached the scene. Officer Idler admitted that he did not see any weapons when he arrived. As he approached, he heard Daniels say something (ostensibly to the SUV) and saw the black SUV, which had been idling, leave at a normal, lawful speed. Neither before nor after being stopped did Daniels make any threatening or evasive movements, and he complied with all Officer Idler's orders. Daniels had no firearms on him, and he was dressed in a bright, eye-catching orange jumpsuit—which seems to be a somewhat counterintuitive fashion choice for someone committing, or about to commit, a crime and hoping to get away with it.

The most glaring thing about these circumstances viewed together is what there is not: any hint of any kind of illegality whatsoever. True, "[c]onduct that may be wholly

---

[7] For those keeping score, the Buccaneers ended the night with a final victory of 31–9 over the Chiefs.

innocent may nonetheless support a finding of reasonable suspicion in certain circumstances," but here we have trouble identifying anything but innocent conduct. *Johnson*, 364 F.3d at 1192. Even analyzing everything together, we are not persuaded the circumstances known to Officer Idler "tend to show that [Daniels had] committed or [was] about to commit a crime," as reasonable suspicion demands. *Id.* at 1189. There are precious few facts to suggest that criminal activity was "afoot"—and fewer still that Daniels had any role in it, if it was. Whatever is needed to establish reasonable suspicion, this case falls short of that minimal particularized and objective basis we have always required. Because there was no reasonable suspicion to stop Daniels, Officer Idler's investigatory detention of him was unreasonable under the Fourth Amendment, and the district court's order to suppress was proper.

Before concluding, we address two of the government's arguments that the district court's *process* when conducting its totality of the circumstances analysis was improper. First, the government appears to suggest that the district court should not have been allowed to consider and weigh the innocent and unsuspicious facts in the record when determining whether Officer Idler had reasonable suspicion. *See* Aplt. Br. at 27; Aplt. Reply at 11. To the extent that is their argument, it is certainly wrong. The district court was not only empowered, *but required*, to evaluate all the factors in the record when analyzing reasonable suspicion, including facts militating against reasonable suspicion. *See Johnson*, 364 F.3d at 1193 ("All of the[] factors, mitigating and aggravating, should have

been analyzed as part of the totality of the circumstances faced by Officer Middleton at the inception of the detention.").

Second, the government contends that the district court analyzed each factor (the 911 call, the SUV, the time and location) in isolation, rather than weighing them together. To illustrate the kind of analysis we have found impermissible, it points us to *Johnson*. There, too, the district court granted a motion to suppress based on four factors. *See id.* at 1189–90. The court conducted its totality analysis by "proceed[ing] through the factors . . . evaluat[ing] and reject]ing] each before moving on to the next." *Id.* at 1190. The court mentioned the "appropriate 'totality of the circumstances' standard only once, in passing, and only after having analyzed each factor . . . in isolation." *Id.* This, we found, was improper. *Id.* at 1189.

Here, the district court avoided the improper process in *Johnson*. It analyzed each factor individually, but it was clear that it would consider all the facts in its totality analysis: "This Court will analyze each fact, and it will then consider *all the facts together* to determine whether the totality of the circumstances supports a finding of reasonable suspicion sufficient to support the Defendant's detention." Rec., vol. I at 111 (emphasis added). The court did not say that it would consider "all the facts that support reasonable suspicion"; it said "all the facts"—even those it found would not support reasonable suspicion alone. It lived up to its promise. It dedicated an entire section to its totality analysis, separate from the factors, as we have here. In that analysis, the court included

discussion of the 911 call and the SUV along with all the other facts, despite finding the former two insufficient to support reasonable suspicion alone.

The court engaged in the exact process we have approved. It analyzed the relevant factors to determine whether, standing alone, they supported reasonable suspicion; discounted those factors that were weak based on the record; and finally considered all the factors together to analyze as required. That the government was unhappy with the result is not enough to transform its substantive distaste into procedural error.

### Conclusion

Because the circumstances confronting Officer Idler did not amount to reasonable suspicion, his detention of Daniels was unreasonable under the Fourth Amendment. As such, the district court properly granted Daniels' motion to suppress. We affirm.

22-1378, *United States v. Daniels*
**EID**, J., concurring in the judgment.

I generally agree with the majority's opinion, but write separately to express my view regarding the degree of suspicion to be assigned to the 911 call. The majority thinks that the 911 caller described nothing but innocuous conduct. Maj. Op. at 10 (reasoning that the caller described three men armed with guns who only acted "innocuous[ly]"). I disagree. At the same time, however, I agree with the majority that any reasonable suspicion from the call did not attach to Daniels for a simple reason: He did not match the caller's description of the men engaged in suspicious activity.

To begin, unlike the majority, I would find that the 911 caller described three men acting suspiciously. Late at night, at about 11:35 PM, someone called the police reporting that three Black men in dark clothing visibly held "guns in their hands" and "intermittently t[ook] out [the] guns and then put[] them back into their pockets." App'x Vol. I at 107, 112. The caller stated that the men appeared as if "they [we]re getting ready to do something." *Id.* at 112. And the caller went on to say that these three men repeatedly got "in and out" of a "dark color SUV." *Id.* at 107.

If a police officer were to observe that situation, I would think that the three men's "unusual conduct" would lead the officer "reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing [are] armed and presently dangerous." *Terry v. Ohio*, 392 U.S. 1, 30 (1968).

The majority thinks differently. First, as part of its reasoning, the majority states that the 911 call did not establish reasonable suspicion because the officers took the call

as a "non-emergency area watch request." Maj. Op. at 17. It is true that the 911 caller also stated that the situation described was "currently not an emerg[ency]." App'x Vol. I at 112. But surely reasonable suspicion may arise outside of an emergency. What makes that clear is that an officer may confirm or dispel suspicion of a crime before it occurs. *See, e.g.*, *Terry*, 392 U.S. at 30 (involving officers who suspected that two men appeared to be "casing a job" by walking in front of and peering into a store several times). Indeed, crime can still be afoot without an emergency, such as while suspects prepare for a crime, whether it be casing a store for a future robbery or putting guns and equipment in a car like the 911 caller described. *Compare id.*, *with* App'x Vol. I at 107, 112 (describing men in dark clothing getting in and out of an SUV while armed with guns in-hand and appearing as if "they [we]re getting ready to do something" close to midnight).

As the primary reason for finding no suspicious activity from the call, the majority places great weight on an assumption that the call "alleged no criminal activity or dangerous behaviors." Maj. Op. at 8 ("[T]he caller only reported that guns were being intermittently taken in and out of pockets, and that the three men 'look like they are getting ready to do something.'" (citation omitted)). In reaching its holding, the majority relies on the "normative thrust of the Supreme Court's recent decision in" *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1 (2022), to reason that the three men here were "*presumably* exercising their Second Amendment rights in a lawful way." Maj. Op. at 8 (emphasis added).

The problem with the majority's reasoning is that we do not know for certain, under the relevant law or the record, whether the open carry of firearms here was

2

"lawful" or not. *Id.* Colorado leaves the regulation over the open carry of firearms to its local and municipal authorities. *See* Colo. Rev. Stat. Ann. § 29-11.7-104. Looking to the relevant locality here, the City of Aurora leaves the lawfulness of open carried firearms up to public and private property owners.[1] With that in mind, the law here does not necessarily clarify whether the three men described in the 911 call could carry openly because we do not know if the apartment parking lot had any restrictions on open carry of a firearm. And the record does not help us out either in that regard.

This is not a case where we know that individuals merely "exercise[ed] their Second Amendment rights in a lawful way." *Contra* Maj. Op. at 8. Or at least, nothing from the law or record indicates that is the case. Even so, based on nothing more than speculation, the majority holds that the men "*presumably*" open carried guns lawfully. *Id.* (emphasis added).

I would not presume so. I acknowledge that the Supreme Court has said that "bare-boned tips about guns" do not create "an automatic firearm exception" to the Fourth Amendment. *Florida v. J.L.*, 529 U.S. 266, 273 (2000). But the caller here did not just report that the men had guns. There was more: Again, three men dressed in dark clothing, actively moved in and out of cars in a parking lot close to midnight, were

---

[1] *See* Aurora Stat. art. IV, div. 2, § 94-152(a) (providing that "[i]t shall be unlawful for any person, carrying a firearm, to enter or remain upon any private property of another or any building or property of a commercial establishment when such property, building, or establishment is posted with notification that the carrying of firearms is prohibited"); *id.* § 94-154(a) (providing that "[t]he carrying of firearms in or upon public facilities is unlawful when said facilities are posted with notification that the carrying of firearms is prohibited").

3

visibly armed with weapons, and appeared as if "they [we]re getting ready to do something." App'x Vol. I at 107, 112. *That* I would find amounts to a tip "that criminal activity may be afoot." *Terry*, 392 U.S. at 30.

In any case, however, the suspicious activity described on the call does not end this matter. The officers here did not view the situation described on the 911 call with their own eyes. Instead, the officers received a tip that needed to be corroborated. Importantly, "[a] police officer cannot legally detain a person simply because criminal activity is afoot." *United States v. Fisher*, 597 F.3d 1156, 1158 (10th Cir. 2010). Instead, an officer must "suspect[]" that "the particular person stopped" has committed or was committing "criminal activity." *Id.* at 1158–59.

With that in mind, something needed to connect Daniels as one of the men described in the 911 call. Nothing did. Critically, the government concedes that "Officer Idler didn't notice anyone in the area matching the clothing descriptions provided by the 911 caller." Aplt. Br. at 3. And indeed, the record reflects that no officer could reasonably expect Daniels to be one of the men in dark clothing described on the call. Daniels was not wearing a black hoodie. He instead wore a bright orange jumpsuit with a reflective strip across the front. The 911 call also mentioned that the three men went in and out of a dark colored SUV. Daniels did no such thing. Instead, he stood "approximately five to ten feet away" from an SUV, "outside his own home." App'x Vol. I at 107, 121. And lastly, the 911 caller described that the men visibly held "guns in their hands and pockets." *Id.* at 112. Yet again, Daniels did no such thing. At no time

4

did Officer Idler see Daniels with a firearm in hand or on his person, even after the seizure.

As such, I agree with the majority that Daniels did not match the caller's description. *See* Maj. Op. at 9–10.

In sum, unlike the majority, I believe that the 911 call reported suspicious activity. That disagreement aside, I agree with the majority that Daniels did not match the caller's description of the three men acting suspiciously. Any suspicion stemming from the call was dispelled when Officer Idler found no one on the scene that matched the caller's description. For these reasons, I concur in the judgment.