**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**December 30, 2025**

**Christopher M. Wolpert**
**Clerk of Court**

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

ANTOAN RABAN,

    Defendant - Appellant.

No. 24-1359

_____

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 1:23-CR-00329-RMR-1)**
_____

John C. Arceci, Assistant Federal Public Defender (Virginia L. Grady, Federal Public Defender, with him on the briefs), Denver, Colorado, for Defendant-Appellant.

Kyle W. Brenton, Assistant United States Attorney (Jess D. Mekeel, Assistant United States Attorney, and Peter McNeilly, United States Attorney, on the brief), Denver, Colorado, for Plaintiff-Appellee.
_____

Before **PHILLIPS**, **EBEL**, and **EID**, Circuit Judges.
_____

**PHILLIPS**, Circuit Judge.
_____

Two officers stopped a motorist for two violations: driving without a front license plate and failing to use a turn signal. During the traffic stop, the officers learned that the driver, who identified himself as Antoan Raban, was a

criminal gang member. The stop occurred in a high-crime area and a rival gang's territory. And just seconds after the officers stopped Raban, another man, whom the police knew to be a fellow gang member, drove past, turned around, parked across the street from the stop, and called Raban's phone.

The officers called for backup and four more officers soon arrived. Because Raban lacked identification, the officers decided to fingerprint him to verify his identity. They removed Raban from the car and frisked him, finding no weapons. While one officer walked Raban to the curb and prepared the fingerprint reader, a second officer did a protective sweep of the car. That officer found a loaded pistol under the driver's seat and ammunition in the center console.

A federal grand jury charged Raban with possessing a firearm and ammunition as a felon. Raban moved to suppress evidence from the search, arguing that the officers lacked reasonable suspicion for a protective sweep of the car. The district court denied his motion, concluding that the officers reasonably suspected that Raban was dangerous and might access a weapon from inside the car.

Raban pleaded guilty, reserving the right to appeal the district court's suppression decision. Now he does just that. He argues that the officers lacked reasonable suspicion that he was dangerous and might access a weapon, so the court erred by denying his suppression motion.

Exercising jurisdiction under 28 U.S.C. § 1291, we affirm. First, several circumstances, taken together, provided reasonable suspicion that Raban was presently dangerous. And second, when the officer conducted the protective sweep, he reasonably believed that Raban would receive a civil citation and be allowed to return to the car, where he might have had access to a weapon. The officer therefore had reasonable suspicion for the protective sweep.

## BACKGROUND

### I.     Factual Background

In May 2023, two gang-unit police officers—Tyler Danielson and Zachary Moldenhauer—were patrolling a high-crime area in northeast Denver. Soon after 4 p.m., they noticed a car without its front license plate at a gas station. That gas station "saw a lot of crime," including "motor vehicle theft, narcotics sale and distribution, [and] weapons-related offenses." R. vol. I at 123.

When the driver left the gas station, he didn't use a turn signal. So the officers followed and pulled over the car.

Officer Danielson approached the driver-side window, and Officer Moldenhauer approached the passenger side. Because the car had tinted windows, the officers asked the driver—Antoan Raban—to roll down the windows. Raban complied, and the officers saw that he was alone in the car.

The officers soon spotted an open beer can on the backseat floor. They also noticed Raban's face tattoos: the number "3" under each eye, which

3

connected him to the Tre Tre Crips gang. Officer Danielson found Raban's Crips affiliation "odd" because Raban was driving through the territory of a rival-gang, the Bloods. *Id.* at 79. In fact, later during the stop, Raban told Officer Danielson: "If this is your area, I see why y'all would have scoped me out."

After Raban rolled down all four windows, Officer Danielson asked him about the missing license plate. Raban said that the car belonged to his girlfriend and explained that the car's front had been recently damaged in an accident. Raban then looked for, but could not find, the car's registration. He also lacked any identification. So he gave the officers his name, address, and birthday instead.

Meanwhile, seconds after the officers stopped Raban, a white SUV drove past, completed a three-point turn, and parked across the street from the stop. Both officers recognized the SUV's driver: Deshay Armstrong,[1] "a well-known Crip gang member" with a violent criminal history. *Id.* at 79–80, 127. Officer Moldenhauer acknowledged Armstrong by saying "sup, brother." *Id.* at 101, 143. Then the officers noticed Armstrong placing a telephone call. They could see inside Raban's car that the call was to Raban's phone. Raban, ignoring the call, told the officers that Armstrong was his girlfriend's brother.

---

[1] At times, the record reflects Armstrong's first name as "Dashae."

After getting Raban's information, Officer Moldenhauer returned to the police car to run a records check. Officer Danielson stayed with Raban, partly because Armstrong was parked nearby.

Officer Danielson and Raban chatted calmly. Raban explained that the open beer can was from the night before. He also admitted that he didn't have a driver's license. And he said that Armstrong "just so happened to be here."

Around this time, the officers called for backup, largely because of Armstrong. Four more officers soon arrived.

Officer Moldenhauer finished the records check, which revealed that Raban had several violent and weapons-related convictions. It also showed that Raban lacked a valid driver's license. And though the check returned a photo resembling Raban, the photographed individual lacked face tattoos. So to confirm Raban's identity, Officer Moldenhauer decided to fingerprint him.

Without telling Officer Danielson the records-check results, including Raban's criminal history, Officer Moldenhauer asked Danielson to remove Raban from the car for fingerprinting. At the same time, Moldenhauer also told Danielson: "I think he's good." *Id.* at 147.

Officer Danielson asked Raban to exit the car, frisked him, and noticed he was wearing an ankle monitor. Finding no weapons, Danielson passed Raban to Officer Moldenhauer, who walked Raban closer to the police car. Surrounded by several officers, Raban sat on the curb with his legs crossed while Officer Moldenhauer prepared the fingerprint reader.

Officer Danielson then did a protective sweep of the car. He soon found a loaded handgun under the driver's seat. At that point, officers handcuffed Raban. Officers later found a baggie of ammunition in the center console.

## II.    Procedural History

A federal grand jury charged Raban with possessing a firearm and ammunition as a felon in violation of 18 U.S.C. § 922(g)(1).

### A.    Motion to Suppress & Evidentiary Hearing

Raban moved to suppress evidence from the search, arguing that the protective sweep violated the Fourth Amendment. To justify a protective sweep, officers must have reasonable suspicion that the suspect (1) "is dangerous" and (2) "may gain immediate control of weapons." *Michigan v. Long*, 463 U.S. 1032, 1049 (1983). Raban argued that the officers lacked reasonable suspicion that he was dangerous. In response, the government argued that Officer Danielson had reasonable suspicion for the protective sweep based on the area, Raban's gang affiliation and criminal history, Armstrong's presence and conduct during the stop, and Raban's ankle monitor.

The court held an evidentiary hearing. Officers Danielson and Moldenhauer testified about the stop and the circumstances they relied on to justify the protective sweep.

To begin, Officer Danielson testified that the stop occurred in a high-crime area—one with several recent shootings. He also noted that he had "been shot at . . . by a gang member" in that area before. R. vol. I at 109.

6

Officer Danielson then explained the significance of Raban's being in a rival gang's territory. He testified that the Crips did not usually enter the Bloods' "turf." *Id.* at 79. Indeed, Danielson found Raban's presence in Bloods territory especially "odd" "because of recent violence in that neighborhood." *Id.* Officer Moldenhauer similarly attested that the area experienced violent gang activity "specifically" related to "Bloods and Crips relations." *Id.* at 122–23, 131.

Next, the officers testified about Armstrong. Officer Danielson stated that Armstrong's presence concerned him for a few reasons: both Armstrong and Raban were members of the Crips, Armstrong had a violent criminal history, and Armstrong "ha[d] been armed in the past." *Id.* at 80. Danielson explained that sometimes "others . . . attempt to interfere with a traffic stop or try to overwhelm officers to try to distract attention or even use violence against officers." *Id.* at 81. And he testified that "[Raban's] being accompanied by another Crip gang member set off red flags to me that there was a possibility that . . . either he was armed or there were multiple firearms that could potentially be used against us within immediate reach." *Id.* at 87.

Likewise, Officer Moldenhauer testified that Armstrong's presence increased his safety concerns. He explained, "I didn't know what Deshay Armstrong's intentions were being over there . . . . We don't know if Deshay wants us to basically leave the defendant alone and what he's going to do." *Id.* at 129. According to Officer Moldenhauer, this "created a fairly large officer

safety issue." *Id.* Moldenhauer's concerns only increased after learning about Armstrong's personal relationship with Raban.

Finally, Officer Danielson discussed the protective sweep. He testified that he searched the car because he anticipated releasing Raban with only a citation. Though Raban lacked a license, Danielson explained that they would release him to the car with a warning not to drive. But he also added that at some point "it was a consideration that we were going to either park and lock or tow his vehicle from that scene" too. *Id.* at 117–18. Both officers testified that Danielson did not know Raban's criminal history when Danielson searched the car.

### B.    Suppression Rulings

Though deeming it "a close call," the district court orally denied Raban's suppression motion. *Id.* at 176. The court concluded that four considerations together satisfied *Long*'s first prong: (1) the high-crime neighborhood, (2) Raban's gang affiliation, (3) Armstrong's presence, and (4) Raban's ankle monitor. The court ruled that, under the totality of the circumstances, these factors supported reasonable suspicion that Raban was dangerous.

As for *Long*'s second prong, Raban's access to weapons, the court was silent. But at the end of the hearing, the court stated that it "did not find the officers' testimony" about intending to return Raban to the car to be "credible, plausible or otherwise." *Id.* at 176–77. The court found "it hard to imagine that these officers, given what they knew, were going to release this man with a

8

citation." *Id.* at 177. With that in mind, the court emphasized that releasing Raban to the car was "not one of the factors that [it] found to support the reasonable suspicion for the sweep." *Id.*

Hearing this, Raban argued that the court must grant his suppression motion. He reasoned that if officers were not going to release him to the car (as the court had just found), the officers lacked reasonable suspicion that he may access a weapon under *Long*'s second prong. But the court stuck with its original ruling.

Two days later, the court sua sponte invited the parties to move for reconsideration. Raban argued that the court's credibility finding about the officers' intent to return Raban to the car required suppression. Perhaps acknowledging that, the government asked the court to reconsider its credibility finding and rule in the government's favor.

On reconsideration, the district court again denied Raban's suppression motion. *United States v. Raban*, No. 23-cr-00329, 2024 WL 1911223, at *1 (D. Colo. May 1, 2024). Addressing *Long*'s first prong, the court reiterated the facts supporting its earlier finding of reasonable suspicion that Raban was dangerous—his gang tattoos, the high-crime and rival-gang area, Armstrong's presence, and Raban's ankle monitor. *Id.* at *1, 3.

Then the court addressed *Long*'s second prong. This time, the court ruled that it was "reasonable to believe[] . . . that Mr. Raban may have been allowed to leave the scene with a citation and return to his car." *Id.* at *6. Retreating

9

from its earlier credibility finding, the court remarked that "what [it] did not find credible" was "[t]he Government's assertion . . . that Officer Danielson knew of Mr. Raban's criminal history, but that he nevertheless would have returned an individual with Mr. Raban's criminal history to his vehicle without an arrest."[2] *Id.* at *5. As for Raban's access to weapons, the court noted that the hearing testimony and bodycam footage established that Officer Danielson in fact knew nothing about Raban's criminal history before the protective sweep. *Id.* The court also noted that right before the sweep, Officer Moldenhauer had told Danielson that Raban was "good." *Id.*

With all this in mind, the court held that when Officer Danielson "conducted the protective sweep, it was objectively reasonable for [him] to conclude that Mr. Raban could have been permitted to return to his vehicle after receiving a traffic citation." *Id.* (emphasis omitted). So the court again held the protective sweep lawful. *Id.* at *6.

C.    **Guilty Plea, Sentencing & Appeal**

After the district court's denial of his motion to suppress, Raban entered a conditional guilty plea. He reserved his right to appeal the suppression decision. The court sentenced Raban to seventy-one months' imprisonment.

Raban timely appealed, challenging the court's holding on both *Long* prongs.

---

[2] The court never explained why Raban's criminal history would have supported an arrest. *See generally Raban*, 2024 WL 1911223.

**STANDARD OF REVIEW**

When reviewing the denial of a motion to suppress, we consider the totality of the circumstances. *United States v. Canada*, 76 F.4th 1304, 1307 (10th Cir. 2023). "[W]e view the evidence in the light most favorable to the government, accept the district court's finding of fact unless clearly erroneous, and review de novo the ultimate determination of reasonableness under the Fourth Amendment." *Id.* (citation omitted).

Raban does not challenge the court's factual determinations, only its legal conclusion that the officers had reasonable suspicion for the protective sweep. We review that question de novo. *See id.*

**DISCUSSION**

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. This protection extends to cars. *Canada*, 76 F.4th at 1307 ("A vehicle is an effect protected by the Fourth Amendment." (citation modified)).

Typically, a search or seizure is reasonable only if "supported by a warrant based on probable cause." *United States v. Chavez*, 985 F.3d 1234, 1240 (10th Cir. 2021). But protective sweeps do not require warrants. *See Long*, 463 U.S. at 1051. Protective sweeps "exist for officer safety; we do not require officers to take unnecessary risks." *Canada*, 76 F.4th at 1309. Rather, we allow officers to "take steps reasonably necessary to protect their personal safety." *Id.*

11

at 1307 (citation modified). Even so, we limit these warrantless protective searches to areas where a suspect may keep or hide weapons. *See Long*, 463 U.S. at 1049.

To conduct a protective sweep under *Long*, "an officer must have reasonable suspicion that a suspect" (1) "poses a danger" and (2) "may gain immediate access to a weapon." *Canada*, 76 F.4th at 1307. "Reasonable suspicion demands less than probable cause," but "requires the officer to act on something more than an inchoate and unparticularized suspicion or hunch." *Id.* (citation modified). The government bears the burden of proving reasonable suspicion. *United States v. Frazier*, 30 F.4th 1165, 1174 (10th Cir. 2022).

Below, we examine whether the government satisfied that burden for each *Long* prong.

## I.    Presently Dangerous

To satisfy *Long*'s first prong, "the government must show that a reasonable officer would believe the suspect to be presently dangerous." *United States v. McGregor*, 158 F.4th 1082, 1092 (10th Cir. 2025) (citation modified). In reviewing the district court's holding on that point, "we first individually analyze the probative value of each of the relevant factors that the district court relied upon." *Id.* at 1091. Then viewing those factors "collectively and in the context of the totality of the circumstances, we determine whether those factors support a finding of reasonable suspicion." *Id.* at 1091–92.

Raban argues that Officer Danielson had only a "hunch" that Raban was armed and dangerous. But under the totality of the circumstances, several factors support that Officer Danielson reasonably suspected that Raban was presently dangerous.

## A.    Individual Factors

The district court's dangerousness analysis relied on four factors: (1) Raban's gang affiliation, (2) the high-crime and rival-gang neighborhood, (3) Armstrong's presence, and (4) Raban's ankle monitor. *See Raban*, 2024 WL 1911223, at *1, 3. We discuss each factor in turn.

### 1.    Gang Membership

To begin, the court found that Raban's gang membership supported reasonable suspicion of his dangerousness. *Id.* We agree.

We recently held that "[g]ang affiliation can support a finding of reasonable suspicion that an individual is armed and dangerous." *McGregor*, 158 F.4th at 1097–98; *see also United States v. Hammond*, 890 F.3d 901, 907–08 (10th Cir. 2018) (determining that defendant's status as a "known gang member" supported reasonable suspicion). "Specifically, the presence of gang affiliation can allow officers to reasonably determine that an individual is armed." *McGregor*, 158 F.4th at 1098.

But for gang membership to support reasonable suspicion, "officers must have some objective basis for believing that the suspect is contemporaneously or recently associated with a criminal gang." *Id.* What's more, "a defendant's

13

gang affiliation must be accompanied by other factors to ultimately support a reasonable suspicion finding." *Id.* at 1099.

Here, officers had an objectively reasonable basis for believing that Raban was presently affiliated with a gang. Namely, Raban's face tattoos signaled his association with the Tre Tre Crips gang. Highlighting the officers' training and experience with "the significance of such tattoos" and gang affiliations, the district court concluded that Raban's tattoos "represent[ed] some level of commitment" to the Crips. R. vol. I at 174. Indeed, because both Officers Danielson and Moldenhauer were gang-unit officers, we too "credit their expertise and ability to discern" Raban's status as a Crips member. *See McGregor*, 158 F.4th at 1100.

Another factor supporting Raban's current Crips affiliation was Armstrong and his actions at the stop. Armstrong—who arrived just seconds after officers stopped Raban—parked across the street and stared at the officers. Then he called Raban's phone. Raban also told officers that Armstrong was his girlfriend's brother.

Both officers knew Armstrong as "a violent gang member in the community that's been active for a long time." R. vol. I at 127; *see also id.* at 80. And both identified him as another Crips member. Thus, based on Raban's tattoos and his connection to Armstrong, the officers had "some objective basis for believing" that Raban was "contemporaneously or recently associated with a criminal gang." *McGregor*, 158 F.4th at 1098.

14

And so, Raban's gang affiliation supported reasonable suspicion that he was dangerous.

### 2.    Characteristics of the Area

The district court also concluded that the neighborhood's characteristics supported reasonable suspicion. *See Raban*, 2024 WL 1911223, at *1. The defendant's "presence in a high-crime area . . . may be a relevant contextual consideration" for reasonable suspicion. *United States v. Dennison*, 410 F.3d 1203, 1208 (10th Cir. 2005) (citation modified); *see also Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) (holding that "officers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation").

Raban is correct that location alone cannot provide reasonable suspicion that a defendant is dangerous. *See United States v. Huerta*, --- F.4th ----, 2025 WL 3018105, at *7 (10th Cir. Oct. 29, 2025). Even so, the area's characteristics remain relevant to the reasonable-suspicion analysis. *E.g.*, *United States v. Daniels*, 101 F.4th 770, 781–82 (10th Cir. 2024). In fact, location impacts that analysis here in two ways.

First, the officers testified that they stopped Raban in a high-crime area that had experienced an uptick in violence, including multiple shootings. And Officer Danielson testified based on his experience that the people he encountered in this area were more likely to be armed and confrontational. So

Raban's "presence in a high-crime area" supported reasonable suspicion that he was presently dangerous. *See Dennison*, 410 F.3d at 1208.

Second, and more importantly, officers stopped Raban in a rival gang's territory. *Raban*, 2024 WL 1911223, at *1. The officers explained that gang members were often armed, that the area belonged to the Bloods gang, and that the Bloods were the Crips' rivals. Officer Danielson also testified that Raban's presence in a rival gang's territory increased his suspicion that Raban was armed. Officer Moldenhauer, too, testified that the area experienced violent gang activity "specifically" related to "Bloods and Crips relations." R. vol. I at 122–23, 131. So the stop's location provided significant "relevant context[]" for the reasonable-suspicion analysis. *Dennison*, 410 F.3d at 1208 (citation omitted).

Raban's contrary argument misses the mark. He argues that driving "through a 'high crime' area in the heart of a city, or travers[ing] through an enormous area ostensibly controlled by a rival gang, does not mean the person is likely a violent criminal who would use a weapon against a police officer." Reply Br. at 5. We agree. But again, though "insufficient alone," location "c[an] be considered in the totality of the circumstances analysis." *Daniels*, 101 F.4th at 781. And here, Raban's presence in a high-crime area—and rival gang's territory—supported reasonable suspicion that he was dangerous.

### 3.    Armstrong's Presence

Next, we consider whether Armstrong's presence supported reasonable suspicion that Raban was dangerous. We agree with the district court that it did. *See Raban*, 2024 WL 1911223, at \*1.

Others' behavior during a stop can add to the reasonable-suspicion analysis. *See, e.g.*, *Daniels*, 101 F.4th at 781, 783 (considering actions of nearby SUV in totality-of-the-circumstances analysis); *United States v. McHugh*, 639 F.3d 1250, 1257 (10th Cir. 2011) (concluding that "suspicious behavior" by defendant "along with that of his compatriot" "only adds to the 'reasonable suspicion' calculus"); *United States v. Briggs*, 720 F.3d 1281, 1290 (10th Cir. 2013) (noting that defendant's and his companion's suspicious behavior "would have heightened a reasonable officer's suspicion of criminal activity"). In fact, in *Terry v. Ohio*—the foundational reasonable-suspicion case—the Supreme Court considered both the defendant's and his companions' behavior in the reasonable-suspicion analysis. 392 U.S. 1, 22–23, 27–28 (1968).

Here, too, Armstrong's presence and conduct during the stop supported reasonable suspicion that Raban was dangerous. Take Armstrong's conduct. Armstrong drove past the officers just seconds after they stopped Raban. Then

17

Armstrong parked right across the street, called Raban, and watched the encounter.[3]

As discussed, the officers testified that they knew Armstrong was "a well-known Crip gang member" with "a violent criminal history," and that he had been "armed in the past." R. vol. I at 80, 127. The officers' bodycam footage shows that his presence put the officers on edge. In fact, the officers even called for backup because of Armstrong's presence.

Officer Danielson also testified that the two Crips gang members traveling close together through rival-gang territory "set off red flags" that Raban was armed or that "there were multiple firearms that could potentially be used against" the officers. *Id.* at 87. Officer Moldenhauer, too, testified that Armstrong's presence heightened his safety concerns.

Courts "must permit officers to make commonsense judgments and inferences about human behavior." *Kansas v. Glover*, 589 U.S. 376, 380–81 (2020) (citation modified). So we conclude that the on-scene presence of

---

[3] Raban suggests that Armstrong was simply "freely observ[ing] the police" during the stop. Reply Br. at 6. But we credit officers' "ability to distinguish between innocent and suspicious actions." *United States v. Hernandez*, 847 F.3d 1257, 1269 (10th Cir. 2017) (citation omitted). And here, officers used their common sense and experience to conclude that Armstrong's conduct—arriving seconds after Raban was stopped, turning around, parking across the street, calling Raban, and staring at the officers—was not "so innocent . . . as to be innocuous." *See United States v. Simpson*, 609 F.3d 1140, 1147 (10th Cir. 2010) (citation omitted).

18

another Crips gang member with a violent criminal history, and a personal relationship to the defendant, supported reasonable suspicion.

Raban argues that Officer Danielson could not "imput[e]" his "general suspicion" of Armstrong to Raban. Op. Br. at 16. But Officer Danielson did no such thing. Instead, Armstrong's presence heightened officers' concerns *about Raban*. In fact, Danielson stayed with Raban during the records check partly because Armstrong's presence heightened his concerns that *Raban* might "attempt to retrieve [a] type of weapon." R. vol. I at 78–79.

The district court also credited the officers' testimony about Armstrong, concluding that Armstrong's presence "raise[d] more credibility with regard to [the officers'] concern about Mr. Raban's gang affiliation and his propensity for having weapons and the reasonableness of the belief that he may be armed and dangerous." *Id.* at 175–76. And we must "keep in mind that it is the province of the trial court to assess the credibility of witnesses at the suppression hearing and to determine the weight to be given to the evidence presented, and we must give such determinations due deference." *United States v. Hernandez*, 847 F.3d 1257, 1263 (10th Cir. 2017) (citation modified). So we accept the district court's determination that Officer Danielson's reasonable suspicion for the protective sweep centered on Raban—not Armstrong. *See id.*

All in all, we conclude that Armstrong's presence and conduct supported reasonable suspicion that Raban was dangerous.

### 4.    Ankle Monitor

Lastly, the district court concluded that Raban's ankle monitor supported reasonable suspicion. *Raban*, 2024 WL 1911223, at *1. Raban argues that having an ankle monitor carries little weight here; in his view, it shows nothing more than "some sort of legal monitoring." Op. Br. at 16.

We agree that the ankle monitor adds little to the reasonable-suspicion analysis in this case. "Standing alone, a criminal record . . . is not sufficient to create reasonable suspicion of anything." *Hammond*, 890 F.3d at 906 (citation modified). And though criminal history can be "critically relevant" to reasonable suspicion, "the circumstances of the stop itself [must] interact with an individual's criminal history to trigger an officer's suspicions." *Id.* at 907.

Here, Officer Danielson knew only that Raban had an ankle monitor. He never asked why or what for. In fact, he knew nothing about Raban's criminal history. What's more, Officer Danielson never testified that the ankle monitor increased his suspicions that Raban was dangerous.

All told, because Danielson did not know why Raban had an ankle monitor—and because he never asserted that it impacted his safety concerns—the ankle monitor does not weigh heavily in our analysis.

### B.    Totality of the Circumstances

Raban argues that none of the factors discussed above can independently support reasonable suspicion. That's true. Even so, we must consider "the totality of the circumstances," or in other words, the "whole picture," when

20

considering reasonableness. *United States v. Cortez*, 449 U.S. 411, 417 (1981). And here, the "whole picture" supported reasonable suspicion that Raban was dangerous.

Consider *McGregor*. There, we held that the defendant's gang affiliation, furtive movements, and prior robbery conviction, when "viewed collectively and in the light of the totality of the circumstances, provided a solid foundation for the district court's ruling." 158 F.4th at 1105.

Though different factors are at play here, we reach the same conclusion. Officers stopped Raban in a high-crime area known for gang violence. Raban had face tattoos associating him with the Crips. Officer Danielson testified that "gang members are often armed," R. vol. I at 72, tying Raban's gang membership to the likelihood "that weapons may be found" in the car, *see Dennison*, 410 F.3d at 1212; *see also Hammond*, 890 F.3d at 906 (noting in the reasonable-suspicion analysis that officers "knew" gang membership "often suggested the presence of guns"). And right after officers stopped Raban, a well-known Crips member with a violent history—and a personal connection to Raban—parked nearby, called Raban, and stared at the officers. This, too, heightened Officer Danielson's concerns that Raban was dangerous. Not to mention that officers stopped Raban in a rival gang's territory.

These factors taken together gave the officers "more than an inchoate and unparticularized suspicion or hunch" that Raban was "presently dangerous." *Canada*, 76 F.4th at 1307 (citation omitted).

Raban argues that other facts cut against reasonable suspicion. For one, Raban was calm and cooperative throughout the stop. He also compares the facts here to *Hammond*, 890 F.3d at 906–07, noting several factors from that case that are missing here. Along those lines, he emphasizes that it was not nighttime, he did not drive dangerously, he was not in a remote area, he did not move furtively, and officers did not suspect him of another crime.

But these facts do not sway our reasonable-suspicion analysis in Raban's favor. When the *McGregor* defendant raised similar arguments, we rejected them. *See* 158 F.4th at 1105. We explained that "we have previously found reasonable suspicion even when a stop occurred during daytime hours in a residential neighborhood" and that "a defendant's compliance and cooperation with officers do not undercut the probative weight of other factors." *Id.* at 1105–06. Similarly, we have found reasonable suspicion without relying on furtive movements, *see Dennison*, 410 F.3d at 1212–1214, and when officers never suspected the defendant of another crime, *see McGregor*, 158 F.4th at 1087–88.

As the *McGregor* court put it, "these additional factors . . . may weigh in [Raban's] favor on the question of whether there was a reasonable basis to suspect that he was armed and dangerous." *Id.* at 1106. Even so, "they do not alter our ultimate conclusion that the officers had such reasonable suspicion—when the three factors that the district court relied on are viewed collectively and in the context of the totality of the circumstances." *Id.*; *see also Canada*,

76 F.4th at 1309 (concluding that mitigating factors did not dissipate reasonable suspicion).

Viewed collectively—and in the light most favorable to the government—the area's characteristics, Raban's gang affiliation, and Armstrong's presence provided reasonable suspicion that Raban was dangerous.

## II. Immediate Access to Weapons

Under *Long*'s second prong, "an officer must have reasonable suspicion that a suspect . . . may gain immediate access to a weapon." *Canada*, 76 F.4th at 1307. This means officers must have "reason to believe that weapons may be found" in the car and that the suspect may access those weapons. *Id.* at 1307–08. This can happen in three scenarios:

> (1) the suspect could break away from police control and retrieve a weapon from his automobile; (2) the suspect is not placed under arrest, he will be permitted to reenter his automobile, and he will then have access to any weapons inside; and (3) the suspect may be permitted to reenter the vehicle before the investigation is over, and again, may have access to weapons.

*Id.* at 1309 (citation modified).

Here, the officers "had reason to believe that weapons may be found" in the car based on the same factors supporting Raban's dangerousness. *See id.* at 1307–08. As for Raban's weapons access, the district court ruled that the second scenario applied because Officer Danielson reasonably believed the officers would return Raban to the car with a citation. *Raban*, 2024 WL 1911223, at *3, 5.

We think the district court got it right. The second scenario applies if "officers—at the time of the search—had reason to believe they would not detain a suspect further." *Canada*, 76 F.4th at 1310. And here, the court ultimately ruled that Officer Danielson credibly testified that the officers intended to release Raban with a citation.

The district court knew that Raban lacked a driver's license. Yet Officer Danielson explained that, even without a license, the officers would not necessarily prevent Raban from getting in the car; instead, they might advise him not to drive. Crediting this testimony, the court reasoned that the officers could have reasonably expected to release Raban to the car to grab his belongings or wait for a ride. *See Raban*, 2024 WL 1911223, at *5. We give "due deference" to this finding. *Hernandez*, 847 F.3d at 1263 (citation omitted).

But Raban argues that it was unreasonable for Officer Danielson to believe that officers would release him to the car. In support, he emphasizes that Raban "lacked a driver's license, that there was an open container of beer in the car, and there were six officers on the scene."[4] Op. Br. at 9.

---

[4] Raban suggests—with no supporting argument—that he also lacked "demonstrated ownership or authority" over the car. Op. Br. at 22. Raban waived this issue by raising it for the first time on appeal. *See United States v. Burke*, 633 F.3d 984, 988 (10th Cir. 2011). Also, if he lacked authority over the car, he might lack Fourth Amendment standing to challenge the search. *See United States v. Guzman*, 149 F.4th 1132, 1139–40 (10th Cir. 2025). So we find this argument unpersuasive.

Yet these facts do not establish that the officers planned to "detain [Raban] further." *See Canada*, 76 F.4th at 1310. For one, driving without a license is not a criminal offense in Colorado. *See* Colo. Rev. Stat. §§ 42-2-101(1), (10), 42-2-138(1). Nor is driving with an open container. *See id.* § 42-4-1305(2)(c). Rather, these violations are "civil matter[s]." *Id.* § 42-4-1701(1). So the officers could not arrest Raban for those violations. *See People v. Barrientos*, 956 P.2d 634, 636 (Colo. App. 1997). And Raban points to no evidence or law suggesting otherwise.

Instead, Raban contrasts the facts here with those in *Canada*, 76 F.4th 1304. He argues that we "determined [in *Canada*] that officers had reason to believe they would not arrest the defendant when, at the time of the protective sweep, they had not yet learned he had a revoked license." Op. Br. at 23. Raban suggests that if the *Canada* officers had known about the defendant's revoked license beforehand, then the officers would have lacked reasonable suspicion for the search.

True enough, unlike the officers in *Canada*, Officer Danielson knew that Raban lacked a license before he searched the car. But importantly, the offenses here and in *Canada* carry different weight. The *Canada* defendant "was a prohibited possessor with a revoked license," 76 F.4th at 1310—a criminal offense under Kansas law, *see* Kan. Stat. Ann. §§ 8-235(e), 21-6602. Not so here. Before the protective sweep, Raban had allegedly committed only civil traffic offenses. Thus, "[u]ntil the gun was found, there was no reason to doubt

25

that [Raban] (though he did not have a driver's license) would soon be allowed to return to the car." *United States v. Rodriguez*, 33 F.4th 807, 814 (5th Cir. 2022).

Consider the facts in *Rodriguez*. There, officers stopped a car after observing a traffic violation. *Id.* at 809–10. Officers ultimately performed a protective sweep. *Id.* at 810. The defendant—a passenger—had a gun in his jacket, which he had left on the backseat. *Id.*

The defendant challenged the protective sweep, arguing that it was unreasonable to believe that officers would return him to the car. *Id.* at 814. The Fifth Circuit disagreed, holding that even though he did not own the car or have a license, the defendant "could easily have returned to the car" as a passenger. *Id.* The court highlighted that the defendant "had only been detained, not arrested," when the search occurred. *Id.*

Here, too, when Officer Danielson searched the car, Raban "had only been detained, not arrested." *See id.* And Danielson had no reason to think the officers would arrest Raban. In fact, when Officer Moldenhauer asked Danielson to remove Raban from the car, Moldenhauer said: "I think he's good." R. vol. I at 147. So "at the time of the search," Officer Danielson "had reason to believe they would not detain [Raban] further." *See Canada*, 76 F.4th at 1310.

Raban argues that even if officers returned him to the car, six officers were present. So in his view, "there is no reason to believe that the officers on

26

scene . . . could not have effectuated such a return in a safe and controlled manner." Op. Br. at 23.

Though the number of on-scene officers might matter for gun access in the breaking-free scenario,[5] we are unsure how that might impact Raban's gun access if officers released him to the car with a citation. *Cf. McGregor*, 158 F.4th at 1106 ("[A]n increased number of police officers does not necessarily undermine officers' reasonable belief that a suspect is armed and dangerous."). Plus, Raban wasn't alone. Armstrong waited nearby—possibly there to help Raban if he chose to resist the officers. As a result, the number of on-scene officers did not dispel Officer Danielson's reasonable suspicion that Raban may access a weapon once returned to the car.

We conclude that when he conducted the protective sweep, Officer Danielson reasonably believed officers may release Raban to the car.

\*    \*    \*

In the end, officers reasonably suspected both that Raban was dangerous and that he may access a weapon upon release to the car. Because "the Fourth Amendment permits protective sweeps under such conditions," *Canada*, 76 F.4th at 1310, the district court did not err in denying Raban's motion to suppress.

---

[5] Though the government argues that the breaking-free scenario also justified the search, we need not address this argument because we find the sweep lawful under a different scenario.

## CONCLUSION

For these reasons, we affirm the district court's suppression decision and Raban's conviction.